**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George STOFFEY, Defendant-Appellant.**

**No. 12831.**

United States Court of Appeals
Seventh Circuit.

June 13, 1960.

Morris A. Shenker, Murry L. Randall, St. Louis, Mo., for appellant.

C. M. Raemer, U. S. Atty., Sheldon Green, James B. Moses, Asst. U. S. Attys., East St. Louis, Ill., for appellee.

Before HASTINGS, Chief Judge, SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

By this appeal, George Stoffey, defendant, seeks reversal of a judgment of the district court, entered on a jury verdict, convicting him on three counts of an indictment. He was sentenced to five years imprisonment as to each count, the sentences to run concurrently, and was fined $5,000 and costs on count I.

Briefly stated, the indictment charged defendant as follows: Count I, that during the fiscal year ending June 30, 1957, he attempted to evade an excise tax on wagers on which he was required to make return and pay such tax monthly, in violation of 26 U.S.C. § 7201; count II, that during the same fiscal year, he attempted to evade the wagering occupational tax, in violation of 26 U.S.C. § 7201; and count III, that he made certain false statements to special agents of the Internal Revenue Service[1] on May 6, 1957, in violation of 18 U.S.C. § 1001.

The government attempted to prove in this case that defendant was in the business of accepting wagers. There is evidence in the record tending to prove the facts which we now set forth.

Several times prior to May 5, 1957, agents visited England Tavern in East St. Louis, Illinois, where they observed activities indicating that defendant was taking bets at that location. On that date, they obtained a warrant to search the person of defendant for "certain property, namely wagering paraphernalia, more specifically described as bet tickets, United States currency, records and memoranda of a wagering operation being conducted by" defendant. On the same day they obtained a similar warrant to search the first floor of a one-story building known as England Tavern.[2] The agents did not obtain a warrant for arrest of defendant, or for search of his automobile.

At 11 A.M. on May 6, 1957, five agents entered England Tavern. The United States Marshal and a deputy also accompanied them or arrived shortly thereafter. Agent Johnson, in disguise, was already in the tavern.[3] Defendant was not present. Aside from the officers, only two other people were in the tavern, one employed there.

At 11:50 A.M., defendant drove up in his 1956 Buick automobile and parked it on the street near the tavern. He removed his coat and other apparel from the seat of the car and entered the tavern.

The agents (other than Johnson) identified themselves, read part of the search warrant to defendant, searched him, and ordered him to empty his pockets on a table, which he did. Guards were stationed at the doors to prevent anyone from leaving or entering the premises.

Two of the agents (Vicars and Busch) proceeded to seize and inventory all of the objects on, or in the possession of, defendant.[4] Another agent (Dehen) sat by and watched. The record does not reveal

---

1. Who, for brevity, will be sometimes referred to herein as agents.

2. Since no return was made on this warrant, nothing having been seized under it, it is not contained in the record.

3. At 2 P.M., four other agents arrived, so that there were then twelve federal law enforcement officers present.

4. These items were later received in evidence as government exhibits 2 through 86B. They are sports publications, newspapers, 30 bet slips for May 2, 4 and 5, money, notebooks, business cards, slips of paper with business names and phone numbers and checks.

what agent Combrick did during the search which lasted five hours, terminating at 5 P.M. The Marshal and his deputy guarded the doors. Agent Becker monitored the telephone.

Defendant in this court contends that the record shows that at first Harry Rest, present in the tavern, refused to co-operate and that he was subdued by the Marshal and that agent Johnson, pretending not to be an officer, engaged in a 30 minute argument and disturbance with the Marshal, in a pretended effort to leave the building. The government in its brief admits that it is true that there was some sort of disturbance in the tavern, but asserts it is not clear what constituted this disturbance, or exactly how long it lasted.

At about 1:45 P.M., when the inventory was concluded, agent Vicars questioned defendant. Vicars asked him whether he had a federal wagering stamp and defendant replied that he did not. He was then asked what he was doing with betting slips, to which he replied that they were his own bets. He was asked whether he took bets as an agent or principal and he replied "No." [5] He stated that he might assist a friend in making a bet. He was asked the size of such bets, to which he replied, "$5, $10, or $20".

At some point in the interview, but not at the beginning, he talked about his constitutional rights or was told of his constitutional rights, but the record does not reveal what he was told. There is no evidence that he was told that he need not talk.

At 2 P.M., four other agents (Edwards, Taake, Kohnen, and Noelker) arrived and assisted in searching the premises.

Agent Vicars then asked how defendant got to the tavern, to which he replied that he had driven there in his car which he had parked on the street in front of the tavern. Agent Vicars then told him that "inasmuch as he had driven there in his car and parked at England's Tavern and that [they] had found this stuff on him, the car was also going to be seized." Vicars "told him [they] could tow it down to the garage or he could give [them] the keys." Defendant then gave Vicars the keys. Whereupon, Vicars and Busch gave defendant a receipt for the items seized, which receipt included the automobile. At the time defendant surrendered the keys, 12 officers were present.

At 2:50 P.M., defendant was formally placed under arrest by the Marshal and taken away by him. At 2:55 P.M. agents Dehen, Edwards and Noelker went into the street and seized the defendant's automobile. After seizing it, they searched it, finding 254 old betting slips and other old records in the trunk. These betting slips covered the week of August 13 to August 19, 1956. Two of the agents (Noelker and Taake) later took the car to the Federal Building. At least one of the agents (Vicars) remained at the tavern until 5 P.M.

The agents later made return only on the warrant for the search of defendant's person.[6] This return included the automobile. No mention was made in the return of the items found in the automobile.

At the trial 7 government witnesses testified that they called defendant and gave their bets to him.

1. Count III charged that defendant on or about May 6, 1957, in violation of 18 U.S.C. § 1001, did in a matter within the jurisdiction of the Treasury Department of the United States, Internal Revenue Service, knowingly and willfully make fictitious and fraudulent statements and representations of material facts to Thomas J. Vicars and Allan J. Busch, agents thereof, and that said statements were that defendant had never accepted wagers from anyone in person, that said

---

5. At the trial defendant testified that the slips represented entries made on behalf of a Mr. Kilpatrick, a bookie for whom defendant was merely a bookkeeper, and that Kilpatrick was deceased at the time of the trial.

6. Apparently nothing was found in the building in the officers' five-hour search.

betting slips found on his person represented bets made by himself and that wagers made by him on behalf of friends did not exceed $20 per bet. Count III alleged facts showing that these statements and representations were false.

It appears from the facts above set forth that the statements referred to were elicited by agent Vicars at about 1:45 P.M. while defendant was still in the England Tavern, which had been for about two hours in the actual possession of several agents and other United States officers, who were clearly asserting control over the premises and those within it. That a decision to take possession of the tavern and defendant's automobile had already been considered before the entry by the agents is evidenced by the affidavits of several of them, upon which search warrants were issued by the district court. The affidavits recited that various agents had reason to believe that defendant was conducting a wagering operation on which no tax had been paid, constituting "a fraud upon the revenue".

It will be noted that the activities of the agents at the time the alleged false statements were made by defendant had already culminated in the actual detention of defendant. He was questioned and gave the answers now said to violate § 1001 after officers had restricted the liberty of his movement, and for all practical purposes he was under arrest. Formal arrest followed swiftly. In Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, the court recently said:

> " * * * When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete. * * *"

We are thus presented with a case where defendant, restricted of liberty, was pressed with questions, answers to which (if true, according to the government) would have been confessions of guilt. The purpose of the agents was not to investigate or to obtain information, but to obtain admissions. They had already reached their decision that this was a case for an arrest and they had acted accordingly. Moreover, they were not thereafter diverted from their course by alleged false statements of defendant.

§ 1001 provides:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The history of § 1001 is set forth in United States v. Bramblett, 348 U.S. 503, 504, 75 S.Ct. 504, 99 L.Ed. 594. During the Civil War, to prevent and punish frauds upon the government, the act of March 2, 1863, 12 Stat. 696, was enacted. In its application it was limited to military personnel. The court, 348 U.S. at page 505, 75 S.Ct. at page 506 said:

> "False statements were proscribed in the following clause of the same section in these terms:
>
> " 'any person in such forces or service who shall, for the purpose of obtaining, or aiding in obtaining, the approval or payment of such claim, make, use, or cause to be made or used, any false bill, receipt, voucher, entry, roll, account, claim, statement, certificate, affidavit, or deposition, knowing the same to contain any false or fraudulent statement or entry.' "

From 1863 to 1934 the coverage of the act was extended. In 1934, 48 Stat. 996, 1938, 52 Stat. 197, and 1948, 62 Stat. 749, further amendments were made and the act as it now reads has existed since 1948. 18 U.S.C. § 1001. Neither by the language contained in the act, nor by its historical development, does it appear to us that it was the congressional intent to apply this penal stat-

ute to statements made by a person under the circumstances existing in this case. The matter within the jurisdiction of the treasury department of the United States, internal revenue service, at the time the alleged fictitious and fraudulent statements and representations of material facts were made by defendant to agents Vicars and Busch of said service, was the physical custody of defendant and the physical possession of his tavern, in which he was detained by said agents. This detention and possession by the agents resulted from their investigation which they had considered sufficient to justify that result. It is obvious that his answers were no part of the prior investigation, the taking of possession of the tavern or his detention by the agents. His questioning under these circumstances was not such a matter within the jurisdiction of the treasury department as is contemplated by § 1001. Accordingly, we hold that that section was not violated and that the judgment of conviction on count III must be reversed.

2. Prior to trial, defendant made a motion to suppress evidence. It was directed against certain property seized from his automobile by the agents. To sustain the legality of that seizure, agent Busch testified for the government that the agents had no search warrant for the automobile, which was parked on the street at and after 11:50 A.M. After defendant had been physically detained in the tavern as heretofore related, from 11:50 A.M. until 2 P.M., agent Vicars told him that they could tow the car to the garage or he could give them the keys.[7] Defendant having thereupon been placed under arrest at 2:50 P.M., he was taken away from the premises by the Marshal. Five minutes later three agents went into the street and seized defendant's automobile, searched it, found 254 old betting slips and other old records in the trunk, and took the car to the Federal Building. These betting slips were introduced into evidence by the gov-

ernment at the trial and were used in the preparation of a government exhibit known as a "projection". Also, at the trial, agents compared the bet slips seized from the automobile with published information as to baseball games and horse-races and testified that the bet slips covered the week of August 13 to August 19, 1956.

Defendant contends that the search of the automobile and the seizure of items therefrom was illegal and prejudicial.

■ It is clear that from 11:50 A.M. until 2:50 P.M., this automobile was immobile. From the time that defendant parked the car until he was arrested and led away, he was in the tavern and the car was in the street. While he had the keys to the car in his possession until 2 P.M., he could not get out of the tavern to get into the car, and he was induced by the threat of Vicars that the car would be towed away to turn over the keys. The agents had no search warrant for the car. They had plenty of time to secure a search warrant. The seizure of the car was not incidental to the arrest of defendant. The arrest both in fact and in law was consummated before the car was seized. There was no risk of the car being driven away while a search warrant was being obtained.

The fourth amendment to the constitution of the United States provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is unreasonable searches that are prohibited by the fourth amendment. Carroll v. United States, 267 U.S. 132, 147, 45 S.Ct. 280, 69 L.Ed. 543; United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed. 653. We are not here

---

7. On oral argument in this court, government counsel stated that the government does not rely on these facts to prove that defendant consented to what was done with his car.

confronted with an arrest of defendant in his automobile. Neither are we confronted with a case where law enforcing officers find it necessary to make a search in a moving automobile or one which has been temporarily halted and which may be moved away by the occupant at any moment. The automobile here searched without a search warrant was not in movement and was not occupied by defendant at the time of the search or at the time of his arrest. In fact, government agents had made it impossible for him to drive it away. Under these circumstances the search of his automobile was unreasonable.

In Carroll v. United States, supra, officers stopped suspected bootleggers of liquor as they drove along a road, searched the car and found 68 bottles of liquor. It was held that they were justified in their action and that the search was not unreasonable.

Helpful language of Mr. Justice Frankfurter in a dissent in the Rabinowitz case was emphasized by the Second Circuit Court of Appeals in United States v. Kancso, 252 F.2d 220, 223:

"* * * Even in the dissent of Mr. Justice Frankfurter he recognized that there were certain situations which excused the procuring of a search warrant 'i. e., the justifications that dispense with search warrants when searching the person in his extension, which is his body and that which his body can immediately control, and moving vehicles' (339 U. S. at page 83, 70 S.Ct. at page 443)."

In the Kancso case, at page 224, the court said:

"There is a vast difference between entering and searching homes or even hotel rooms which are fixed and more or less permanent locations and stopping a person or car on a highway for the same purpose. A warrant can usually be obtained in the first situation without too much risk that the object of the search will disappear. At least, in balance, protection under the Fourth Amend-

ment outweighs the possible advantage of search without a warrant. In the second situation the pedestrian on the street and the car on the highway will not obligingly preserve their status quo; therefore, law enforcement agents must act immediately. * * * "

In direct contrast, in the case at bar, defendant's automobile occupied an established status quo, which made it certain that no risk of escape of the car would have been involved if the officers took time to obtain a search warrant.

In Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, Mr. Justice Jackson said:

"* * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

In a well considered opinion, the Fifth Circuit Court of Appeals said, in Rent v. United States, 209 F.2d 893, 899:

"We think that one of the facts and circumstances to be considered in this case is the fact that there was no reason for not submitting to a magistrate the evidence which the officer deemed sufficient to justify a search of the automobile. The need for effective law enforcement is not satisfied as against the right of privacy by any necessity for the officer to take the decision into his own hands. The officer had ample opportunity to apply for a search warrant and in our opinion a search of the automobile without a warrant was not justified. Johnson v. United States, supra. With the exclusion of the evidence of possession of the seven ounces of marihuana found upon this illegal search, the conviction of Rent under the second count of the indictment cannot stand."

Absent a search warrant, the search of the car and the seizure of its contents, followed by their use in securing the conviction of defendant, on all three counts

of the indictment, constituted prejudicial error, for which we must reverse the judgment below.

As to counts I and II, this case is remanded for a new trial.

Judgment reversed as to all counts and remanded as to counts I and II.