## BROGAN *v.* UNITED STATES

No. 96–1579.   Argued December 2, 1997—Decided January 26, 1998

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined, and in which SOUTER, J., joined in part. SOUTER, J., filed a statement concurring in part and concurring in the judgment, *post,* p. 408. GINSBURG, J., filed an opinion concurring in the judgment, in which SOUTER, J., joined, *post,*

p. 408. STEVENS, J., filed a dissenting opinion, in which BREYER, J., joined, *post,* p. 418.

*Stuart Holtzman* argued the cause and filed briefs for petitioner.

*Solicitor General Waxman* argued the cause for the United States. With him on the brief were *Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben, Edward C. DuMont,* and *Nina Goodman.**

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether there is an exception to criminal liability under 18 U. S. C. § 1001 for a false statement that consists of the mere denial of wrongdoing, the so-called "exculpatory no."

## I

While acting as a union officer during 1987 and 1988, petitioner James Brogan accepted cash payments from JRD Management Corporation, a real estate company whose employees were represented by the union. On October 4, 1993, federal agents from the Department of Labor and the Internal Revenue Service visited petitioner at his home. The agents identified themselves and explained that they were seeking petitioner's cooperation in an investigation of JRD and various individuals. They told petitioner that if he wished to cooperate, he should have an attorney contact the United States Attorney's Office, and that if he could not afford an attorney, one could be appointed for him.

The agents then asked petitioner if he would answer some questions, and he agreed. One question was whether he had received any cash or gifts from JRD when he was a union officer. Petitioner's response was "no." At that point, the

---

*\*Scott L. Nelson* and *Lisa Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

agents disclosed that a search of JRD headquarters had produced company records showing the contrary. They also told petitioner that lying to federal agents in the course of an investigation was a crime. Petitioner did not modify his answers, and the interview ended shortly thereafter.

Petitioner was indicted for accepting unlawful cash payments from an employer in violation of 29 U. S. C. §§ 186(b)(1), (a)(2), and (d)(2), and making a false statement within the jurisdiction of a federal agency in violation of 18 U. S. C. § 1001. He was tried, along with several co-defendants, before a jury in the United States District Court for the Southern District of New York, and was found guilty. The United States Court of Appeals for the Second Circuit affirmed the convictions, 96 F. 3d 35 (1996). We granted certiorari on the issue of the "exculpatory no." 520 U. S. 1263 (1997).

## II

At the time petitioner falsely replied "no" to the Government investigators' question, 18 U. S. C. § 1001 (1988 ed.) provided:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

By its terms, 18 U. S. C. § 1001 covers "any" false statement—that is, a false statement "of whatever kind," *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997) (internal quotation marks and citation omitted). The word "no" in response to a question assuredly makes a "statement," see, *e. g.*, Webster's New International Dictionary 2461 (2d ed. 1950) (def.

2: "That which is stated; an embodiment in words of facts or opinions"), and petitioner does not contest that his utterance was false or that it was made "knowingly and willfully." In fact, petitioner concedes that under a "literal reading" of the statute he loses. Brief for Petitioner 5.

Petitioner asks us, however, to depart from the literal text that Congress has enacted, and to approve the doctrine adopted by many Circuits which excludes from the scope of § 1001 the "exculpatory no." The central feature of this doctrine is that a simple denial of guilt does not come within the statute. See, e. g., Moser v. United States, 18 F. 3d 469, 473–474 (CA7 1994); United States v. Taylor, 907 F. 2d 801, 805 (CA8 1990); United States v. Equihua-Juarez, 851 F. 2d 1222, 1224 (CA9 1988); United States v. Cogdell, 844 F. 2d 179, 183 (CA4 1988); United States v. Tabor, 788 F. 2d 714, 717–719 (CA11 1986); United States v. Fitzgibbon, 619 F. 2d 874, 880–881 (CA10 1980); United States v. Chevoor, 526 F. 2d 178, 183–184 (CA1 1975), cert. denied, 425 U. S. 935 (1976). There is considerable variation among the Circuits concerning, among other things, what degree of elaborated tale-telling carries a statement beyond simple denial. See generally Annot., 102 A. L. R. Fed. 742 (1991). In the present case, however, the Second Circuit agreed with petitioner that his statement would constitute a "true 'exculpatory n[o]' as recognized in other circuits," 96 F. 3d, at 37, but aligned itself with the Fifth Circuit (one of whose panels had been the very first to embrace the "exculpatory no," see Paternostro v. United States, 311 F. 2d 298 (CA5 1962)) in categorically rejecting the doctrine, see United States v. Rodriguez-Rios, 14 F. 3d 1040 (CA5 1994) (en banc).

Petitioner's argument in support of the "exculpatory no" doctrine proceeds from the major premise that § 1001 criminalizes only those statements to Government investigators that "pervert governmental functions"; to the minor premise that simple denials of guilt to Government investigators do not pervert governmental functions; to the conclusion that

§ 1001 does not criminalize simple denials of guilt to Government investigators. Both premises seem to us mistaken. As to the minor: We cannot imagine how it could be true that falsely denying guilt in a Government investigation does not pervert a governmental function. Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very *purpose* of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function. It could be argued, perhaps, that a *disbelieved* falsehood does not pervert an investigation. But making the existence of this crime turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly strange; such a defense to the analogous crime of perjury is certainly unheard of.[1] Moreover, as we shall see, the only support for the "perversion of governmental functions" limitation is a statement of this Court referring to the *possibility* (as opposed to the certainty) of perversion of function—a possibility that exists whenever investigators are told a falsehood relevant to their task.

In any event, we find no basis for the major premise that only those falsehoods that pervert governmental functions are covered by § 1001. Petitioner derives this premise from a comment we made in *United States* v. *Gilliland,* 312 U. S. 86 (1941), a case involving the predecessor to § 1001. That earlier version of the statute subjected to criminal liability " 'whoever shall knowingly and willfully . . . make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit,

---

[1] "The government need not show that because of the perjured testimony, the grand jury threw in the towel. . . . Grand jurors . . . are free to disbelieve a witness and persevere in an investigation without immunizing a perjurer." *United States* v. *Abrams,* 568 F. 2d 411, 421 (CA5), cert. denied, 437 U. S 903 (1978). See generally 70 C. J. S. Perjury § 13, pp. 260–261 (1987).

or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, in any matter within the jurisdiction of any department or agency of the United States . . . .'" *Id.*, at 92–93. The defendant in *Gilliland,* relying on the interpretive canon *ejusdem generis,*[2] argued that the statute should be read to apply only to matters in which the Government has a financial or proprietary interest. In rejecting that argument, we noted that Congress had specifically amended the statute to cover "'any matter within the jurisdiction of any department or agency of the United States,'" thereby indicating "the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *Id.*, at 93. Petitioner would elevate this statement to a holding that § 1001 does not apply where a perversion of governmental functions does not exist. But it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy—even assuming that it is possible to identify that evil from something other than the text of the statute itself. The holding of *Gilliland* certainly does not exemplify such a practice, since it *rejected* the defendant's argument for a limitation that the text of the statute would not bear. And even the relied-upon dictum from *Gilliland* does not support restricting text to supposed purpose, but to the contrary acknowledges the reality that the reach of a statute often exceeds the precise evil to be eliminated. There is no inconsistency whatever between the proposition that Congress intended "to protect the authorized functions of governmental departments and agencies from the perversion which might result" and the propo-

---

[2] "Under the principle of *ejusdem generis,* when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & Western R. Co.* v. *Train Dispatchers,* 499 U. S. 117, 129 (1991).

sition that the statute forbids *all* "the deceptive practices described." *Ibid.*

The second line of defense that petitioner invokes for the "exculpatory no" doctrine is inspired by the Fifth Amendment. He argues that a literal reading of § 1001 violates the "spirit" of the Fifth Amendment because it places a "cornered suspect" in the "cruel trilemma" of admitting guilt, remaining silent, or .falsely denying guilt. Brief for Petitioner 11. This "trilemma" is wholly of the guilty suspect's own making, of course. An innocent person will not find himself in a similar quandary (as one commentator has put it, the innocent person lacks even a "lemma," Allen, The Simpson Affair, Reform of the Criminal Justice Process, and Magic Bullets, 67 U. Colo. L. Rev. 989, 1016 (1996)). And even the honest and contrite guilty person will not regard the third prong of the "trilemma" (the blatant lie) as an available option. The *bon mot* "cruel trilemma" first appeared in Justice Goldberg's opinion for the Court in *Murphy* v. *Waterfront Comm'n of N. Y. Harbor,* 378 U. S. 52 (1964), where it was used to explain the importance of a suspect's Fifth Amendment right to remain silent when subpoenaed to testify in an official inquiry. Without that right, the opinion said, he would be exposed "to the cruel trilemma of self-accusation, perjury or contempt." *Id.,* at 55. In order to validate the "exculpatory no," the elements of this "cruel trilemma" have now been altered—ratcheted up, as it were, so that the right to remain silent, which was the *liberation* from the original trilemma, is now *itself* a cruelty. We are not disposed to write into our law this species of compassion inflation.

Whether or not the predicament of the wrongdoer run to ground tugs at the heartstrings, neither the text nor the spirit of the Fifth Amendment confers a privilege to lie. "[P]roper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely." *United States* v. *Ap-*

*felbaum*, 445 U. S. 115, 117 (1980). See also *United States v. Wong*, 431 U. S. 174, 180 (1977); *Bryson v. United States*, 396 U. S. 64, 72 (1969). Petitioner contends that silence is an "illusory" option because a suspect may fear that his silence will be used against him later, or may not even know that silence is an available option. Brief for Petitioner 12–13. As to the former: It is well established that the fact that a person's silence can be used against him—either as substantive evidence of guilt or to impeach him if he takes the stand—does not exert a form of pressure that exonerates an otherwise unlawful lie. See *United States v. Knox*, 396 U. S. 77, 81–82 (1969). And as for the possibility that the person under investigation may be unaware of his right to remain silent: In the modern age of frequently dramatized "Miranda" warnings, that is implausible. Indeed, we found it implausible (or irrelevant) 30 years ago, unless the suspect was "in custody or otherwise deprived of his freedom of action in any significant way," *Miranda v. Arizona*, 384 U. S. 436, 445 (1966).

Petitioner repeats the argument made by many supporters of the "exculpatory no," that the doctrine is necessary to eliminate the grave risk that § 1001 will become an instrument of prosecutorial abuse. The supposed danger is that overzealous prosecutors will use this provision as a means of "piling on" offenses—sometimes punishing the denial of wrongdoing more severely than the wrongdoing itself. The objectors' principal grievance on this score, however, lies not with the hypothetical prosecutors but with Congress itself, which has decreed the obstruction of a legitimate investigation to be a separate offense, and a serious one. It is not for us to revise that judgment. Petitioner has been unable to demonstrate, moreover, any history of prosecutorial excess, either before or after widespread judicial acceptance of the "exculpatory no." And finally, if there is a problem of supposed "overreaching" it is hard to see how the doctrine of the "exculpatory no" could solve it. It is easy enough for

an interrogator to press the liar from the initial simple denial
to a more detailed fabrication that would not qualify for
the exemption.

### III

A brief word in response to the dissent's assertion that the
Court may interpret a criminal statute more narrowly than
it is written: Some of the cases it cites for that proposition
represent instances in which the Court did *not* purport to be
departing from a reasonable reading of the text, *United
States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 77–78 (1994);
*Williams* v. *United States*, 458 U. S. 279, 286–287 (1982). In
the others, the Court applied what it thought to be a back-
ground interpretive principle of general application. *Sta-
ples* v. *United States*, 511 U. S. 600, 619 (1994) (construing
statute to contain common-law requirement of *mens rea*);
*Sorrells* v. *United States*, 287 U. S. 435, 446 (1932) (constru-
ing statute not to cover violations produced by entrapment);
*United States* v. *Palmer*, 3 Wheat. 610, 631 (1818) (construing
statute not to apply extraterritorially to noncitizens). Also
into this last category falls the dissent's correct assertion
that the present statute does not "mak[e] it a crime for an
undercover narcotics agent to make a false statement to
a drug peddler." *Post*, at 419 (opinion of STEVENS, J.).
Criminal prohibitions do not generally apply to reasonable
enforcement actions by officers of the law. See, *e. g.*, 2
P. Robinson, Criminal Law Defenses § 142(a), p. 121 (1984)
("Every American jurisdiction recognizes some form of law
enforcement authority justification").

It is one thing to acknowledge and accept such well defined
(or even newly enunciated), generally applicable, background
principles of assumed legislative intent. It is quite another
to espouse the broad proposition that criminal statutes do
not have to be read as broadly as they are written, but
are subject to case-by-case exceptions. The problem with
adopting such an expansive, user-friendly judicial rule is that
there is no way of knowing when, or how, the rule is to be

invoked. As to the when: The only reason JUSTICE STEVENS adduces for invoking it here is that a felony conviction for this offense seems to him harsh. Which it may well be. But the instances in which courts may ignore harsh penalties are set forth in the Constitution, see Art. I, § 9; Art. III, § 3; Amdt. 8; Amdt. 14, § 1; and to go beyond them will surely leave us at sea. And as to the how: There is no reason in principle why the dissent chooses to mitigate the harshness by saying that § 1001 does not embrace the "exculpatory no," rather than by saying that § 1001 has no application unless the defendant has been warned of the consequences of lying, or indeed unless the defendant has been put under oath. We are again at sea.

To be sure, some of this uncertainty would be eliminated, at our stage of judging, if we wrenched out of its context the principle quoted by the dissent from Sir Edward Coke, that *"communis opinio* is of good authoritie in law,"[3] and if we applied that principle consistently to a consensus in the judgments of the courts of appeals. (Of course the courts of appeals themselves, and the district courts, would still be entirely at sea, until such time as a consensus would have developed.) But the dissent does not propose, and its author has not practiced, consistent application of the principle, see, e. g., *Hubbard* v. *United States*, 514 U. S. 695, 713 (1995) (opinion of STEVENS, J.) ("We think the text of § 1001 forecloses any argument that we should simply ratify the body of cases adopting the judicial function exception"); *Chapman* v. *United States*, 500 U. S. 453, 468 (1991) (STEVENS, J., dissenting) (disagreeing with the unanimous conclusions of the Courts of Appeals that interpreted the criminal statute at

---

[3] Coke said this in reference not to statutory law but to the *lex communis,* which most of his illustrious treatise dealt with. 1 E. Coke, Institutes 186a (15th ed. 1794). As applied to that, of course, the statement is not only true but almost an iteration; it amounts to saying that the common law is the common law.

issue); thus it becomes yet another user-friendly judicial rule to be invoked *ad libitum*.

*   *   *

In sum, we find nothing to support the "exculpatory no" doctrine except the many Court of Appeals decisions that have embraced it. While *communis error facit jus* may be a sadly accurate description of reality, it is not the normative basis of this Court's jurisprudence. Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so, and no matter how widely the blame may be spread. Because the plain language of § 1001 admits of no exception for an "exculpatory no," we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE SOUTER, concurring in part and concurring in the judgment.

I join the opinion of the Court except for its response to petitioner's argument premised on the potential for prosecutorial abuse of 18 U. S. C. § 1001 as now written (*ante*, at 405–406). On that point I have joined JUSTICE GINSBURG's opinion espousing congressional attention to the risks inherent in the statute's current breadth.

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, concurring in the judgment.

Because a false denial fits the unqualified language of 18 U. S. C. § 1001, I concur in the affirmance of Brogan's conviction. I write separately, however, to call attention to the extraordinary authority Congress, perhaps unwittingly, has conferred on prosecutors to manufacture crimes. I note, at the same time, how far removed the "exculpatory no" is from the problems Congress initially sought to address when it

proscribed falsehoods designed to elicit a benefit from the Government or to hinder Government operations.

## I

At the time of Brogan's offense, § 1001 made it a felony "knowingly and willfully" to make "any false, fictitious or fraudulent statements or representations" in "any matter within the jurisdiction of any department or agency of the United States." 18 U. S. C. § 1001 (1988 ed.). That encompassing formulation arms Government agents with authority not simply to apprehend lawbreakers, but to generate felonies, crimes of a kind that only a Government officer could prompt.[1]

This case is illustrative. Two federal investigators paid an unannounced visit one evening to James Brogan's home. The investigators already possessed records indicating that Brogan, a union officer, had received cash from a company that employed members of the union Brogan served. (The agents gave no advance warning, one later testified, because they wanted to retain the element of surprise. App. 5.) When the agents asked Brogan whether he had received any money or gifts from the company, Brogan responded "No." The agents asked no further questions. *After* Brogan just said "No," however, the agents told him: (1) the Government had in hand the records indicating that his answer was false; and (2) lying to federal agents in the course of an investigation is a crime. Had counsel appeared on the spot, Brogan likely would have received and followed advice to amend his

---

[1] See Note, Fairness in Criminal Investigations Under the Federal False Statement Statute, 77 Colum. L. Rev. 316, 325–326 (1977) ("Since agents may often expect a suspect to respond falsely to their questions, the statute is a powerful instrument with which to trap a potential defendant. Investigators need only informally approach the suspect and elicit a false reply and they are assured of a conviction with a harsh penalty even if they are unable to prove the underlying substantive crime." (footnotes omitted)).

answer, to say immediately: "Strike that; I plead not guilty." But no counsel attended the unannounced interview, and Brogan divulged nothing more. Thus, when the interview ended, a federal offense had been completed—even though, for all we can tell, Brogan's unadorned denial misled no one.

A further illustration. In *United States* v. *Tabor*, 788 F. 2d 714 (CA11 1986), an Internal Revenue Service (IRS) agent discovered that Tabor, a notary public, had violated Florida law by notarizing a deed even though two signatories had not personally appeared before her (one had died five weeks before the document was signed). With this knowledge in hand, and without "warn[ing] Tabor of the possible consequences of her statements," *id.*, at 718, the agent went to her home with a deputy sheriff and questioned her about the transaction. When Tabor, regrettably but humanly, denied wrongdoing, the Government prosecuted her under § 1001. See *id.*, at 716. An IRS agent thus turned a violation of state law into a federal felony by eliciting a lie that misled no one. (The Eleventh Circuit reversed the § 1001 conviction, relying on the "exculpatory no" doctrine. *Id.*, at 719.)

As these not altogether uncommon episodes show,[2] § 1001 may apply to encounters between agents and their targets

---

[2] See, *e. g., United States* v. *Stoffey*, 279 F. 2d 924, 927 (CA7 1960) (defendant prosecuted for falsely denying, while effectively detained by agents, that he participated in illegal gambling; court concluded that "purpose of the agents was not to investigate or to obtain information, but to obtain admissions," and that "they were not thereafter diverted from their course by alleged false statements of defendant"); *United States* v. *Dempsey*, 740 F. Supp. 1299, 1306 (ND Ill. 1990) (after determining what charges would be brought against defendants, agents visited them "with the purpose of obtaining incriminating statements"; when the agents "received denials from certain defendants rather than admissions," Government brought § 1001 charges); see also *United States* v. *Goldfine*, 538 F. 2d 815, 820 (CA9 1976) (agents asked defendant had he made any out-of-state purchases, investigators already knew he had, he stated he had not; based on that false statement, defendant was prosecuted for violating § 1001).

"under extremely informal circumstances which do not sufficiently alert the person interviewed to the danger that false statements may lead to a felony conviction." *United States* v. *Ehrlichman,* 379 F. Supp. 291, 292 (DC 1974). Because the questioning occurs in a noncustodial setting, the suspect is not informed of the right to remain silent. Unlike proceedings in which a false statement can be prosecuted as perjury, there may be no oath, no pause to concentrate the speaker's mind on the importance of his or her answers. As in Brogan's case, the target may not be informed that a false "No" is a criminal offense until *after* he speaks.

At oral argument, the Solicitor General forthrightly observed that § 1001 could even be used to "escalate completely innocent conduct into a felony." Tr. of Oral Arg. 36. More likely to occur, "if an investigator finds it difficult to prove some elements of a crime, she can ask questions about other elements to which she already knows the answers. If the suspect lies, she can then use the crime she has prompted as leverage or can seek prosecution for the lie as a substitute for the crime she cannot prove." Comment, False Statements to Federal Agents: Induced Lies and the Exculpatory No, 57 U. Chi. L. Rev. 1273, 1278 (1990) (footnote omitted). If the statute of limitations has run on an offense—as it had on four of the five payments Brogan was accused of accepting—the prosecutor can endeavor to revive the case by instructing an investigator to elicit a fresh denial of guilt.[3] Prosecution in these circumstances is not an instance of Gov-

---

[3] Cf. *United States* v. *Bush,* 503 F. 2d 813, 815–819 (CA5 1974) (after statute of limitations ran on § 1001 charge for defendant Bush's first affidavit containing a false denial, IRS agents elicited a new affidavit, in which Bush made a new false denial; court held that "Bush cannot be prosecuted for making a statement to Internal Revenue Service agents when those agents aggressively sought such statement, when Bush's answer was essentially an exculpatory 'no' as to possible criminal activity, and when there is a high likelihood that Bush was under suspicion himself at the time the statement was taken and yet was in no way warned of this possibility").

ernment "punishing the denial of wrongdoing more severely than the wrongdoing itself," *ante*, at 405; it is, instead, Government generation of a crime when the underlying suspected wrongdoing is or has become nonpunishable.

## II

It is doubtful Congress intended § 1001 to cast so large a net. First enacted in 1863 as part of the prohibition against filing fraudulent claims with the Government, the false statement statute was originally limited to statements that related to such filings. See Act of Mar. 2, 1863, ch. 67, 12 Stat. 696–697. In 1918, Congress broadened the prohibition to cover other false statements made "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States." Act of Oct. 23, 1918, ch. 194, § 35, 40 Stat. 1015–1016. But the statute, we held, remained limited to "cheating the Government out of property or money." *United States* v. *Cohn*, 270 U. S. 339, 346 (1926).

"The restricted scope of the 1918 Act [as construed in *Cohn*] became a serious problem with the advent of the New Deal programs in the 1930's." *United States* v. *Yermian*, 468 U. S. 63, 80 (1984) (REHNQUIST, J., dissenting). The new regulatory agencies relied heavily on self-reporting to assure compliance; if regulated entities could file false reports with impunity, significant Government interests would be subverted even though the Government would not be deprived of any property or money. See generally *United States* v. *Gilliland*, 312 U. S. 86, 93–95 (1941). The Secretary of the Interior, in particular, expressed concern that "there were at present no statutes outlawing, for example, the presentation of false documents and statements to the Department of the Interior in connection with the shipment of 'hot oil,' or to the Public Works Administration in connection with the transaction of business with that agency." *United States* v. *Yermian*, 468 U. S., at 80 (REHNQUIST, J., dissenting).

In response to the Secretary's request, Congress amended the statute in 1934 to include the language that formed the basis for Brogan's prosecution. See *Hubbard* v. *United States*, 514 U. S. 695, 707 (1995) ("We have repeatedly recognized that the 1934 Act was passed at the behest of 'the Secretary of the Interior to aid the enforcement of laws relating to the functions of the Department of the Interior.'") (quoting *United States* v. *Gilliland*, 312 U. S., at 93–94). Since 1934, the statute, the relevant part of which remains the same today,[4] has prohibited the making of "any false or fraudulent statements or representations . . . in any matter within the jurisdiction of any department or agency of the United States or of any corporation in which the United States of America is a stockholder." Act of June 18, 1934, ch. 587, § 35, 48 Stat. 996.

As the lower courts that developed the "exculpatory no" doctrine concluded, the foregoing history demonstrates that § 1001's "purpose was to protect the Government from the affirmative, aggressive and voluntary actions of persons who take the initiative; and to protect the Government from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions." *Paternostro* v. *United States*, 311 F. 2d 298, 302 (CA5 1962); accord, *United States* v. *Stark*, 131 F. Supp. 190, 205 (Md. 1955). True, "the 1934 amendment, which added the current statutory language, was not limited by any specific set of circumstances that may have precipitated its passage." *United States* v. *Rodgers*, 466 U. S. 475, 480 (1984). Yet it is noteworthy that Congress enacted that amendment to address concerns quite far removed from suspects' false denials of criminal misconduct, in the course of informal interviews initiated by Government

---

[4] Congress separated the false claims from the false statements provisions in the 1948 recodification, see Act of June 25, 1948, §§ 287, 1001, 62 Stat. 698, 749, and made unrelated substantive changes in 1996, see False Statements Accountability Act of 1996, Pub. L. 104–292, 110 Stat. 3459.

agents. Cf. ALI, Model Penal Code § 241.3, Comment 1, p. 151 (1980) ("inclusion of oral misstatements" in § 1001 was "almost [an] accidental consequenc[e] of the history of that law").

### III

Even if the encompassing language of § 1001 precludes judicial declaration of an "exculpatory no" defense, the core concern persists: "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman* v. *United States*, 356 U. S. 369, 372 (1958).[5] The Government has not been blind to this concern. Notwithstanding the prosecution in this case and the others cited *supra*, at 410–411, and n. 2, the Department of Justice has long noted its reluctance to approve § 1001 indictments for simple false denials made to investigators. Indeed, the Government once asserted before this Court that the arguments supporting the "exculpatory no" doctrine "are forceful even if not necessarily dispositive." Memorandum for United States in *Nunley* v. *United States*, O. T. 1977, No. 77–5069, p. 7; see also *id.*, at 7–8 (explaining that "[t]he legislative history affords no express indication that Congress meant Section 1001 to prohibit simple false denials of guilt to government officials having no regulatory responsibilities other than the discovery and deterrence of crime").

In *Nunley*, we vacated a § 1001 conviction and remanded with instructions to dismiss the indictment, at the Solicitor General's suggestion. *Nunley* v. *United States*, 434 U. S. 962 (1977). The Government urged such a course because the prosecution had been instituted without prior approval from the Assistant Attorney General, and such permission was "normally refused" in cases like Nunley's, where the

---

[5] Deterrence of Government-manufactured crimes is not at stake where a false denial of wrongdoing forms the basis, not for the imposition of criminal liability, but for an adverse employment action. For that reason, *Lachance* v. *Erickson, ante*, p. 262, is inapposite.

statements "essentially constitute[d] mere denials of guilt." Memorandum for United States, *supra*, at 8.

Since *Nunley*, the Department of Justice has maintained a policy against bringing § 1001 prosecutions for statements amounting to an "exculpatory no." At the time the charges against Brogan were filed, the United States Attorneys' Manual firmly declared: "Where the statement takes the form of an 'exculpatory no,' 18 U. S. C. § 1001 does not apply regardless who asks the question." United States Attorneys' Manual ¶ 9–42.160 (Oct. 1, 1988). After the Fifth Circuit abandoned the "exculpatory no" doctrine in *United States* v. *Rodriguez-Rios*, 14 F. 3d 1040 (1994) (en banc), the manual was amended to read: "It is the Department's policy that it is not appropriate to charge a Section 1001 violation where a suspect, during an investigation, merely denies his guilt in response to questioning by the government." United States Attorneys' Manual ¶ 9–42.160 (Feb. 12, 1996).[6]

These pronouncements indicate, at the least, the dubious propriety of bringing felony prosecutions for bare exculpatory denials informally made to Government agents.[7] Although today's decision holds that such prosecutions can be sustained under the broad language of § 1001, the Department of Justice's prosecutorial guide continues to caution restraint in each exercise of this large authority.

---

[6] While this case was pending before us, the Department of Justice issued yet another version of the manual, which deleted the words "that it is" and "appropriate" from the sentence just quoted. The new version reads: "It is the Department's policy not to charge a Section 1001 violation in situations in which a suspect, during an investigation, merely denies guilt in response to questioning by the government." United States Attorneys' Manual ¶ 9–42.160 (Sept. 1997).

[7] The Sentencing Guidelines evince a similar policy judgment. Although United States Sentencing Commission, Guidelines Manual § 3C1.1 (Nov. 1997) establishes a two-level increase for obstruction of justice, the application notes provide that a "defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) . . . is not a basis for application of this provision." § 3C1.1, comment., n. 1.

## IV

The Court's opinion does not instruct lower courts automatically to sanction prosecution or conviction under § 1001 in all instances of false denials made to criminal investigators. The Second Circuit, whose judgment the Court affirms, noted some reservations. That court left open the question whether "to violate Section 1001, a person must know that it is unlawful to make such a false statement." *United States* v. *Wiener*, 96 F. 3d 35, 40 (1996). And nothing that court or this Court said suggests that "the mere denial of criminal responsibility would be sufficient to prove such [knowledge]." *Ibid.* Moreover, "a trier of fact might acquit on the ground that a denial of guilt in circumstances indicating surprise or other lack of reflection was not the product of the requisite criminal intent," *ibid.*, and a jury could be instructed that it would be permissible to draw such an inference. Finally, under the statute currently in force, a false statement must be "materia[l]" to violate § 1001. See False Statements Accountability Act of 1996, Pub. L. 104–292, § 2, 110 Stat. 3459.

The controls now in place, however, do not meet the basic issue, *i. e.*, the sweeping generality of § 1001's language. Thus, the prospect remains that an overzealous prosecutor or investigator—aware that a person has committed some suspicious acts, but unable to make a criminal case—will create a crime by surprising the suspect, asking about those acts, and receiving a false denial. Congress alone can provide the appropriate instruction.

Congress has been alert to our decisions in this area, as its enactment of the False Statements Accountability Act of 1996 (passed in response to our decision in *Hubbard* v. *United States*, 514 U. S. 695 (1995)) demonstrates. Similarly, after today's decision, Congress may advert to the "exculpatory no" doctrine and the problem that prompted its formulation.

The matter received initial congressional consideration some years ago. Legislation to revise and recodify the federal criminal laws, reported by the Senate Judiciary Committee in 1981 but never enacted, would have established a "defense to a prosecution for an oral false statement to a law enforcement officer" if "the statement was made 'during the course of an investigation of an offense or a possible offense and the statement consisted of a denial, unaccompanied by any other false statement, that the declarant committed or participated in the commission of such offense.'" S. Rep. No. 97–307, p. 407 (1981). In common with the "exculpatory no" doctrine as it developed in the lower courts, this 1981 proposal would have made the defense "available only when the false statement consists solely of a denial of involvement in a crime." *Ibid.* It would not have protected a denial "if accompanied by any other false statement (e. g., the assertion of an alibi)." *Ibid.*[8]

The 1981 Senate bill covered more than an "exculpatory no" defense; it addressed frontally, as well, unsworn oral statements of the kind likely to be made without careful deliberation or knowledge of the statutory prohibition against false statements. The bill would have criminalized false oral statements to law enforcement officers only "where the statement is either volunteered (e. g., a false alarm or an unsolicited false accusation that another person has committed an offense) or is made after a warning, designed to impress on the defendant the seriousness of the interrogation and his obligation to speak truthfully." *Id.,* at 408.

More stringent revision, following the lead of the Model Penal Code and the 1971 proposal of a congressionally chartered law reform commission, would excise unsworn oral

---

[8] See, *e. g., United States* v. *Moore,* 27 F. 3d 969, 979 (CA4 1994) ("exculpatory no" doctrine covers simple denials of criminal acts, but "does not extend to misleading exculpatory stories or affirmative statements . . . that divert the government in its investigation of criminal activity").

statements from § 1001 altogether. See ALI, Model Penal Code §§ 241.3, 241.4, 241.5 (1980); National Commission on Reform of Federal Criminal Laws, Final Report §§ 1352, 1354 (1971). A recodification proposal reported by the House Judiciary Committee in 1980 adopted that approach. It would have applied the general false statement provision only to statements made in writing or recorded with the speaker's knowledge, see H. R. Rep. No. 96–1396, pp. 181–183 (1980); unsworn oral statements would have been penalized under separate provisions, and only when they entailed misprision of a felony, false implication of another, or false statements about an emergency, see id., at 182. The 1971 law reform commission would have further limited § 1001; its proposal excluded from the false statement prohibition all "information given during the course of an investigation into possible commission of an offense unless the information is given in an official proceeding or the declarant is otherwise under a legal duty to give the information." National Commission on Reform of Federal Criminal Laws, Final Report § 1352(3).

In sum, an array of recommendations has been made to refine § 1001 to block the statute's use as a generator of crime while preserving the measure's important role in protecting the workings of Government. I do not divine from the Legislature's silence any ratification of the "exculpatory no" doctrine advanced in lower courts. The extensive airing this issue has received, however, may better inform the exercise of Congress' lawmaking authority.

JUSTICE STEVENS, with whom JUSTICE BREYER joins, dissenting.

Although I agree with nearly all of what JUSTICE GINSBURG has written in her concurrence—a concurrence that raises serious concerns that the Court totally ignores—I dissent for the following reasons.

The mere fact that a false denial fits within the unqualified language of 18 U. S. C. § 1001 is not, in my opinion, a sufficient reason for rejecting a well-settled interpretation of that statute. It is not at all unusual for this Court to conclude that the literal text of a criminal statute is broader than the coverage intended by Congress. See, *e. g., Staples* v. *United States,* 511 U. S. 600, 605, 619 (1994); *United States* v. *X-Citement Video, Inc.,* 513 U. S. 64, 68–69 (1994) (departing from "most natural grammatical reading" of statute because of "anomalies which result from this construction," and presumptions with respect to scienter in criminal statutes and avoiding constitutional questions); *id.,* at 81 (SCALIA, J., dissenting) (stating that lower court interpretation of statute rejected by the Court was "quite obviously *the only grammatical reading*"); *Williams* v. *United States,* 458 U. S. 279, 286 (1982) (holding that statute prohibiting the making of false statements to a bank was inapplicable to depositing of a "bad check" because "the Government's interpretation . . . would make a surprisingly broad range of unremarkable conduct a violation of federal law"); *Sorrells* v. *United States,* 287 U. S. 435, 448 (1932) ("We are unable to conclude that it was the intention of the Congress in enacting [a Prohibition Act] statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them"); *United States* v. *Palmer,* 3 Wheat. 610, 631 (1818) (opinion of Marshall, C. J.) (holding that although "words 'any person or persons,' [in maritime robbery statute] are broad enough to comprehend every human being[,] . . . general words must not only be limited to cases within the jurisdiction of the state, but also to those objects to which the legislature intended to apply them"). Although the text of § 1001, read literally, makes it a crime for an undercover narcotics agent to make a false statement to a drug peddler, I am confident

that Congress did not intend any such result. As JUSTICE GINSBURG has explained, it seems equally clear that· Congress did not intend to make every "exculpatory no" a felony.[1]

Even if that were not clear, I believe the Court should show greater respect for the virtually uniform understanding of the bench and the bar that persisted for decades with, as JUSTICE GINSBURG notes, *ante,* at 414–415, the approval of this Court as well as the Department of Justice.[2] See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 192–198 (1994) (STEVENS, J., dissenting); *McNally* v. *United States,* 483 U. S. 350, 362–364, 376 (1987) (STEVENS, J., dissenting).[3] Or, as Sir Edward Coke phrased it, "it is the common opinion, and *communis*

---

[1] "[M]eaning in law depends upon an understanding of purpose. Law's words, however technical they may sound, are not magic formulas; they must be read in light of their purposes, if we are to avoid essentially arbitrary applications and harmful results." *Behrens* v. *Pelletier,* 516 U. S. 299, 324 (1996) (BREYER, J., dissenting).

[2] It merits emphasis that the Memorandum for the United States filed in support of its confession of error in *Nunley* v. *United States,* 434 U. S. 962 (1977), contains a detailed discussion of the many cases that had endorsed the "exculpatory no" doctrine after the 1934 amendment to § 1001. Memorandum for United States in *Nunley* v. *United States,* O. T. 1977, No. 77–5069, pp. 4–8.

[3] Although I do not find the disposition of this case as troublesome as the decision in *McNally,* this comment is nevertheless apt:

"Perhaps the most distressing aspect of the Court's action today is its casual—almost summary—rejection of the accumulated wisdom of the many distinguished federal judges who have thoughtfully considered and correctly answered the question these cases present. The quality of this Court's work is most suspect when it stands alone, or virtually so, against a tide of well-considered opinions issued by state or federal courts. In these cases I am convinced that those judges correctly understood the intent of the Congress that enacted this statute. Even if I were not so persuaded, I could not join a rejection of such a longstanding, consistent interpretation of a federal statute." *McNally* v. *United States,* 483 U. S., at 376–377 (STEVENS, J., dissenting).

*opinio* is of good authoritie in law."[4]    1 E. Coke, Institutes 186a (15th ed. 1794).

Accordingly, I respectfully dissent.

---

[4] The majority's invocation of the maxim *communis error facit jus* adds little weight to their argument.    As Lord Ellenborough stated in *Isherwood* v. *Oldknow*, 3 Maule & Selwyn 382, 396–397 (K. B. 1815):

"It has been sometimes said, *communis error facit jus;* but I say *communis opinio* is evidence of what the law is; not where it is an opinion merely speculative and theoretical floating in the minds of persons, but where it has been made the ground-work and substratum of practice." See also *United States* v. *The Reindeer*, 27 F. Cas. 758, 762 (No. 16,145) (CC RI 1848).