**STATE of Minnesota, Respondent,**

v.

**Melissa Jean CRAWLEY, Appellant.**

No. A09–1795.

Court of Appeals of Minnesota.

Sept. 28, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Charles E. MacLean, Winona County Attorney, Stephanie E. Nuttall, Thomas E. Gort, Assistant County Attorneys, Winona, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Jodie L. Carlson, Assistant Public Defender, St. Paul, MN; and Scott M. Flaherty, Special Assistant Public Defender, Briggs and Morgan, P.A., Minneapolis, MN, for appellant.

Mary Vasaly, Abigail Richey–Allen, Sarah Riskin, Maslon Edelman Borman &

Brand, LLP, Minneapolis, MN; and Teresa Nelson, American Civil Liberties Union of Minnesota, St. Paul, MN, for amicus curiae.

Considered and decided by MINGE, Presiding Judge; JOHNSON, Judge; and HARTEN, Judge.*

## OPINION

MINGE, Judge.

Appellant challenges her conviction of falsely reporting police misconduct, arguing that the statute violates the First Amendment's prohibition on viewpoint discrimination. Because the statute singles out a limited category of otherwise unprotected statements for criminalization and the limited category does not meet the exceptions to content-based discrimination established by the United States Supreme Court in *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), we reverse.

## FACTS

In 2008, appellant Melissa Crawley filed a report of police misconduct with the Winona Police Department. The report asserted that a Winona officer forged Crawley's signature on a medical release to obtain her medical records while investigating Crawley's claim that a third party had assaulted her. During an investigation into Crawley's police-misconduct complaint, a nurse said she witnessed Crawley sign the release.

The state charged Crawley with the criminal offenses of falsely reporting police misconduct, Minn.Stat. § 609.505, subd. 2, and falsely reporting a crime, Minn.Stat. § 609.505, subd. 1 (2006). Subdivision 2 provides,

> Whoever informs, or causes information to be communicated to, a peace officer, whose responsibilities include investigating or reporting police misconduct, that a peace officer ... has committed an act of police misconduct, knowing that the information is false, is guilty of a crime....

Crawley moved to dismiss the charge under subdivision 2 on grounds that the provision violates the First Amendment to the United States Constitution, arguing that the provision constitutes viewpoint discrimination by criminalizing only those who knowingly make false statements that criticize police. The district court denied the motion.

A jury found Crawley guilty on both counts. The district court dismissed the count under subdivision 1 as a lesser-included offense. It sentenced Crawley to 195 days in jail, 180 days stayed for two years with conditions. Crawley appeals the conviction, asserting the First Amendment challenge.

## ISSUE

Does Minn.Stat. § 609.505, subd. 2, violate the First Amendment's prohibition against viewpoint discrimination?

## ANALYSIS

■■■ Crawley argues that subdivision 2 violates the First Amendment by criminalizing speech based on the viewpoint of the speaker.[1] Constitutional challenges

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. We recognize that statutes similar to subdivision 2 have been held unconstitutional by federal courts. *See Chaker v. Crogan,* 428 F.3d 1215, 1228 (9th Cir.2005); *Hamilton v. City of San Bernardino,* 325 F.Supp.2d 1087,

1095 (C.D.Cal.2004); *Eakins v. Nevada,* 219 F.Supp.2d 1113, 1121 (D.Nev.2002). The California Supreme Court upheld the California statute prior to *Chaker. People v. Stanistreet,* 29 Cal.4th 497, 127 Cal.Rptr.2d 633, 58 P.3d 465, 474 (2002). We consider cases from federal and other states' courts for their persuasive value. *State v. McClenton,* 781

are questions of law that this court reviews de novo. *State v. Bussmann,* 741 N.W.2d 79, 82 (Minn.2007). "[A]ny provision of law restricting [First Amendment] rights does not bear the usual presumption of constitutionality normally accorded to legislative enactments." *Johnson v. State Civil Serv. Dep't,* 280 Minn. 61, 66, 157 N.W.2d 747, 751 (1968). In deciding a legitimate free-speech challenge, the court "proceed[s] with the understanding that the state bears the burden of establishing the statute's constitutionality." *State by Humphrey v. Casino Mktg. Grp.,* 491 N.W.2d 882, 886 (Minn.1992).

## I. The First Amendment and Viewpoint Discrimination/R.A.V.

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that government shall "make no law . . . abridging the freedom of speech." U.S. Const. Amend. I.[2] The First Amendment's safeguard of expression on issues of public concern "is a fundamental principle of our constitutional system." *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) (quotation omitted). " 'It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.' " *Id.* (quoting *Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941)).

These protections, however, are not absolute. *Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003). The government may, consistent with the Constitution, proscribe or regulate certain forms of expression. *Id.* This is because "our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *R.A.V.,* 505 U.S. at 382–83, 112 S.Ct. at 2542–43.

■■■ The provision challenged here criminalizes speech in the form of the *intentional lie.* The *intentional lie* is one type of expressive action that fails to "materially advance[ ] society's interest in uninhibited, robust, and wide-open debate on public issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) (quotation omitted); *see also United States v. Daly,* 756 F.2d 1076, 1081–82 (5th Cir.1985) (upholding statute criminalizing aiding and assisting in making false statements to federal government on First Amendment challenge) (citing *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965)). Knowingly communicating a false statement against public agencies causes significant harm in the form of "perversion" of "governmental departments and agencies." *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 523, 85 L.Ed. 598 (1941) (noting Congress's interest in statute punishing false statements made to federal government). The state asserts this harm—the disruption of police functions and investigations—as a proper basis for the challenged provision.[3] As harmful conduct, the intentional falsehood is a

N.W.2d 181, 191 (Minn.App.2010), *review denied* (Minn. June 29, 2010).

**2.** Although Crawley's challenge is based entirely on our federal Constitution, we note that the Minnesota Constitution also provides that, "[t]he liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right." Minn. Const. art. I, § 3.

**3.** On appeal, the state disclaims any interest in remedying reputational injury. Therefore we do not analyze the statute as one criminalizing defamatory communications.

mode of speech that can be regulated without regard to the substance of that speech.[4] *Chaker*, 428 F.3d at 1225; *see United States v. Masters*, 484 F.2d 1251, 1254 (10th Cir.1973) (upholding constitutionality of perjury statute and noting that it punishes "specific conduct that infringes a substantial government interest").

But American caselaw "surely do[es] not establish the proposition that the First Amendment imposes no obstacle whatsoever to regulation of particular instances of such proscribable expression, so that the government may regulate them freely." *R.A.V.*, 505 U.S. at 384, 112 S.Ct. at 2543 (quotation and modification omitted). Put another way, even though intentional falsehoods are subject to regulation, the government cannot pick and choose which falsehoods to prohibit so as to criminalize certain false statements but not others based on the content of the speech or viewpoint of the speaker. *See id.* at 383–84, 112 S.Ct. at 2543.

Determining the protections for such otherwise unprotected speech is a delicate task. Our guide in this undertaking is the majority opinion of Justice Antonin Scalia in *R.A.V.*, a landmark case declaring a St. Paul ordinance banning certain cross burnings to be unconstitutional. *Id.* at 391, 112 S.Ct. at 2547. St. Paul punished cross burning as a hate crime, but only punished the activity when it intimidated based on race, color, creed, or gender. *Id.* at 380, 112 S.Ct. at 2541. Although cross burning was "proscribable" as fighting words, the Court pointed out that the First Amendment would not allow

> an ordinance prohibiting only those [proscribable] works that contain criticism of the city government or, indeed, that do not include endorsement of the city government. Such a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.

*Id.* at 381, 384, 112 S.Ct. at 2542–43. Thus, "[t]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *Id.* at 384, 112 S.Ct. at 2543. St. Paul's selective cross-burning ordinance, though it criminalized proscribable "fighting words," improperly discriminated based on content by only applying to certain topics (e.g., race, gender). *Id.* at 391, 112 S.Ct. at 2547. What was worse, according to the Court, was that the subclassification

---

**4.** The dissent's view that obscenity, fighting words, and defamation are the only forms of speech subject to regulation disregards several lines of First Amendment precedent. We recognize that those speech forms have traditionally and exclusively received a *categorical* exclusion from First Amendment scrutiny. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (listing "narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem"); Daniel Farber, *The Categorical Approach to Protecting Speech in American Constitutional Law*, 84 Ind. L.J. 917, 920–25 (2009) (discussing the evolution of the categorical approach). But the First Amendment allows for certain regulation of speech in other settings, including but not limited to those where the speech (1) is ex-

pressed by a soldier or public-school student, *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980) (soldiers); *Morse v. Frederick*, 551 U.S. 393, 396–97, 127 S.Ct. 2618, 2622, 168 L.Ed.2d 290 (2007) (students); (2) regards commercial transactions, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978); or (3) is targeted by a restriction narrowly tailored to achieve a compelling government interest, *Burson v. Freeman*, 504 U.S. 191, 211, 112 S.Ct. 1846, 1857–58, 119 L.Ed.2d 5 (1992). These cases demonstrate that First Amendment doctrine allows for varying accommodations and is not as rigid as the dissent's categorical method suggests. *See* Farber, 84 Ind. L.J. at 928 (noting "complex tapestry" of speech-restriction doctrines).

amounted to viewpoint discrimination because, under the ordinance,

> "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. [Under the ordinance, o]ne could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis de Queensberry [5] rules.

*Id.* at 391–92, 112 S.Ct. at 2547–48 (footnote added).

■■■ In accordance with *R.A.V.*,[6] it is clear that the state may not regulate the use of the intentional falsehood "based on hostility—or favoritism—towards the underlying message expressed." *See id.* at 386, 112 S.Ct. at 2545 (discussing fighting words as "mode of speech" that can be regulated but not for its underlying message). The provision challenged in this case punishes only those known falsehoods that are *critical* of police conduct. Minn. Stat. § 609.505, subd. 2. Like the ordinance invalidated in *R.A.V.*, this distinction singles out a certain viewpoint for punishment: knowingly making false statements that assert or confirm an allegation of an officer's misconduct is criminal, while knowingly making false statements to absolve an officer of wrongdoing is not. This distinction is problematic for two main reasons:

■■■ First, punishing only false statements critical of police officers runs afoul of the basic principle that laws cannot exempt otherwise punished expression because the statement expresses approval of the government. *See Schacht v. United States*, 398 U.S. 58, 63, 90 S.Ct. 1555, 1559, 26 L.Ed.2d 44 (1970) (considering a federal statute that criminalized unauthorized wearing of a military uniform except in theatrical performances that do not discredit the armed forces and holding that a statute that "leaves Americans free to praise the war in Vietnam but can send persons ... to prison for opposing it ... cannot survive in a country which has the First Amendment"). "It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300,

---

**5.** The Marquis of Queensberry was a British aristocrat who created gentlemanly rules to govern boxing.

**6.** The state contends that, because it asserts an interest in preserving investigatory resources and not in limiting criticism of police, the statute should be analyzed not under *R.A.V.*, but under cases analyzing time, place, and manner restrictions. Such a restriction is not constitutional unless it is "adequately justified 'without reference to the content of the regulated speech.'" *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428, 113 S.Ct. 1505, 1516, 123 L.Ed.2d 99 (1993) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753 (1989)

(quotation omitted)). However, where a statute regulates speech based on a permissible basis, but singles out certain viewpoints, the *R.A.V.* standard is appropriate. *R.A.V.*, 505 U.S. at 386, 112 S.Ct. at 2545. The state's asserted interest in protecting the integrity of government investigations is not ignored under this analysis: the *R.A.V.* framework allows for a content-based distinction within proscribed speech if it is justified without reference to the position of the speaker or the speech's message. *Id.* at 389, 112 S.Ct. at 2546. Accordingly, we address in section II.b. the argument of whether wasted investigatory costs are a proper rationale for the viewpoint distinction.

1305 (8th Cir.1986). The challenged provision of Minn.Stat. § 609.505, subd. 2, defies this principle by singling out only *critical* statements about government actors.

Second, from a practical standpoint, the distinction unevenly constrains one side of discussion on a highly charged, public issue. *See R.A.V.*, 505 U.S. at 391, 112 S.Ct. at 2547–48. In disputes over the propriety of police conduct, the resolution of allegations often comes down to the credibility of the complainant, the accused, or other witnesses and police officers. *Chaker*, 428 F.3d at 1226; *see* Susan Bandes, *Tracing the Pattern of No Pattern: Stories of Police Brutality*, 34 Loy. L.A. L.Rev. 665, 669 (2001) ("Questions of credibility are of paramount importance in resolving brutality claims, since most brutality takes place in secret. . . ."). Knowingly making false statements that attempt to absolve a police officer of misconduct can compromise a meritorious case. The state cannot allow pro-police witnesses to "fight freestyle" by tolerating them making knowingly false statements that cover up police misdeeds but impose "Queensberry rules" on complainants asserting police misconduct by exposing them to the risk of criminal sanctions if their complaints are later determined to be misrepresentations. *See R.A.V.*, 505 U.S. at 392, 112 S.Ct. at 2548.

## II. R.A.V.'s Three Exceptions to Content Discrimination

*R.A.V.* recognized that a simple prohibition on viewpoint or content distinctions within proscribable categories of speech is unacceptable and that, in certain defined situations, some distinctions are permitted. 505 U.S. at 387–88, 112 S.Ct. at 2545. Consistent with *R.A.V.*, we consider whether the distinction between criminalized and noncriminalized falsehoods in the statute before us fits a recognized exception. The Court identified three categories of exceptions to the prohibition against content discrimination within proscribable speech areas.

### a. Core Basis for Less First Amendment Protection

The first category is limited to rare situations in which the viewpoint or content distinction is limited to and addresses the "very reason" or essence of why the speech is proscribable in the first place. *Id.* at 388, 112 S.Ct. at 2545. For example, the state may ban just that obscenity that is "the most patently offensive in its prurience—i.e., that which involves the most lascivious displays of sexual activity." *Id.* at 388, 112 S.Ct. at 2546. The government can also single out for prohibition threats against the President. *Id.* (citing *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (upholding 18 U.S.C. § 871)). The essence of why presidential threats are proscribable is to protect society from fear of violence, the disruption that such fear engenders, and the possibility that such threatened violence will occur. *Id.* Because these distinctions do not implicate any government agenda in defining what is proscribed and go to the core basis for the general proscription, they do not raise viewpoint-discrimination concerns. *See R.A.V.*, 505 U.S. at 388, 112 S.Ct. at 2545 (noting that *R.A.V.* exceptions cover instances where there is no danger that government is driving viewpoints from the marketplace). The distinction, in these instances, is a crisp rifle shot designed to only address the very reason the First Amendment allows the prohibition.

A known falsehood lacks First Amendment protection because it is wrongful action that misleads the recipient. When known false information is communicated to government officials, there is clear harm in the "perversion" of "authorized functions of governmental departments and agencies." *Gilliland*, 312 U.S. at 93, 61

S.Ct. at 522 (noting Congress's interest in statute punishing false statements made to federal government). This act of intentionally disrupting government functions is the core reason why communicating these known falsehoods lack full speech protection.

Here, the state claims that Minn.Stat. § 609.505, subd. 2, satisfies this *R.A.V.* category because the need to prevent disruptive internal police investigations has special force when the false statement reports police misconduct. The state's claim does not identify a core or essence of proscribable speech, like the examples in *R.A.V.*, of threats to the President (as fighting words) or the most lascivious pornography (as obscenity). As a proscription of communicating known false information, the restriction applies to knowingly-made false reports of misconduct about peace officers, a large category that includes new recruits and top leadership. By limiting criminal sanctions to critical false statements, the statute ignores the larger problem that false statements disrupt or derail investigative functions regardless of whether they report misconduct or falsely attempt to absolve a peace officer: "[S]ince it is the very *purpose* of an investigation to uncover the truth, any falsehood relating to the subject of [a government] investigation perverts that function." *Brogan v. United States*, 522 U.S. 398, 402, 118 S.Ct. 805, 809, 139 L.Ed.2d 830 (1998). Because the distinction is not based on the core reason for excluding communication of known falsehoods from full speech protection, we

conclude that it does not fit within this first category.

### b. Secondary Effects

 The second category of exceptions justifying content or viewpoint discrimination applies when "secondary effects" justify the regulation "without reference to the content of the speech." *R.A.V.*, 505 U.S. at 389, 112 S.Ct. at 2546 (quotation and modification omitted). As an example, *R.A.V.* noted that the state could prohibit only obscene live performances involving minors. *Id.* Such a prohibition would be permissible because its justification would be the harm caused to minors, not the expressive aspect of the activity. The secondary-effects rationale is also appropriate when the proscription is "directed at conduct rather than speech." *Id.*

 The state argues that Minn.Stat. § 609.505, subd. 2, singles out false statements of police misconduct because such information triggers "wasted" investigatory costs.[7] Although we acknowledge that this is a type of secondary effect, the government cannot simply assert any secondary consideration to silence speech; the concern must actually *justify* the restriction. *R.A.V.*, 505 U.S. at 389, 112 S.Ct. at 2546 (citing, inter alia, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986)).

The state's interest in avoiding the cost incurred as a result of a false claim of misconduct is subject to limiting considerations. First, the challenged provision does not target underlying harmful conduct: the actual filing of a fraudulent re-

---

7. The legislative history also reveals that the legislature had an interest in preventing the "undermin[ing] [of officer] credibility." Hearing on H.F. No. 618 Before the H. Comm. on Public Safety and Oversight (Feb. 15, 2005) (statement of Rep. Cornish). But this reason cannot justify the statute because the emotive effect or influence of speech on the listener is not a "secondary effect" of speech justifying limitations. *See Boos v. Barry*, 485 U.S. 312, 319–21, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988). We therefore consider only the "perversion of investigative resources," argued by the state on appeal, in our secondary-effects analysis.

port or witness statement. Moreover, the statute is not defined to punish statements that are apt or intended to disrupt or derail an investigation.[8] The statute's failure to target conduct is also reflected in its failure to reach knowing lies that attempt to absolve officers, which, as stated above, equally disrupt investigations. *See Discovery Network*, 507 U.S. at 430, 113 S.Ct. at 1517 (rejecting "secondary effects" justification for banning certain news racks because permitted news racks pose same asserted problem as banned ones).

◼ Second, the Supreme Court has required some minimal showing that secondary effects actually exist and relate to a "substantial government interest." *Renton*, 475 U.S. at 50, 106 S.Ct. 925; *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195–96, 117 S.Ct. 1174, 1189, 137 L.Ed.2d 369 (1997). The state's burden to make such a showing is low, and courts defer to the state's evaluation of local problems. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438–40, 122 S.Ct. 1728, 1736–37, 152 L.Ed.2d 670 (2002). But there must be some evidence that "fairly support[s] the ... rationale for [the statute]." *Id.* at 438, 122 S.Ct. at 1736. The state may not merely "posit the existence of the disease sought to be cured." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994) (plurality opinion) (quotation omitted).

Here, the only information cited by the state to support its secondary-effects concern is a committee-hearing witness's statement alleging many "unsubstantiated" complaints filed in Minneapolis and St. Paul. *See* Hearing on H.F. No. 618 Before the H. Comm. on Public Safety and Oversight (Feb. 15, 2005) (statement of witness Gillespie). That witness stated he was "pulling" these numbers from his "hat." *Id.* Notwithstanding the state's low burden and our deference to the legislature in assessing local problems, we cannot conclude that a rationale not explicitly adopted by the legislature and based on information "pulled out of a hat" is adequate to support the proffered secondary-effects rationale. Even if the data had markings of reliability, we further note that it does not indicate the existence of *knowingly false* complaints, nor does it indicate the costs of investigating false complaints or their effect on government functions. We find the absence of minimally reliable and relevant data especially notable because the existing requirement to investigate police-misconduct allegations is state-created. *See* Minn. R. 6700.2000–.2600 (2009) (providing that law enforcement agencies must establish and follow written procedures for the investigation and resolution of misconduct allegations).

We further note that many other public employees and officials are subject to automatic investigation when a complaint is submitted. *See, e.g.,* Minn.Stat. § 214.10, subd. 2 (2008) (describing government investigative procedures in response to complaints against licensed professionals, including teachers); Minn.Stat. § 10A.02, subds. 10, 11 (2008) (describing investigative powers for campaign finance and public disclosure board in response to complaints against political candidates); Minn. R. Bd. Jud. Standards 1(d); 2(a) (describing investigative powers and duties of board on judicial standards in response to complaints against judges). If we did not require at least some minimal showing of actual abuse of those systems via dishonest complaints, a secondary-effects rationale

---

**8.** We note that other statutes are narrowed, such as the Minnesota law criminalizing tampering with child-custody hearings through false allegations of child abuse. *See* Minn. Stat. § 609.507 (2008). That statute requires, among other things, that the accuser have the intent to influence a child-custody hearing with his or her false statement. *Id.*

could be easily asserted by recitation to justify laws criminalizing false complaints against these figures. In sum, based on the foregoing analysis of the challenged provision and the record, we conclude that the state has not met its burden to justify this speech sanction on a secondary-effects rationale.

### c. De Minimis

 As a last exception, *R.A.V.* allows subclasses of content restriction where "the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." 505 U.S. at 390, 112 S.Ct. at 2547. *R.A.V.* illustrated that there would be no "First Amendment interest that would stand in the way of a State's prohibiting only those obscene motion pictures with blue-eyed actresses." *Id.*

 Compared to the blue-eyed-actress example, the viewpoint discrimination occurring here is not innocuous. A citizen's right to criticize public officials is a core part of the First Amendment. "Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). This protection includes the right "to petition the government for redress of grievances." U.S. Const. Amend. I. The protection includes claims of police misconduct: "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 2509, 96 L.Ed.2d 398 (1987). Given the impact of

law-enforcement officers on the lives of citizens and our communities, the right to report police misconduct is an important aspect of First Amendment protection. We conclude that the third *R.A.V.* category does not apply.

In sum, we conclude that the viewpoint discrimination in Minn.Stat. § 609.505, subd. 2 does not fit within any of the *R.A.V.* categories of exceptions.[9]

### III. Strict Scrutiny

 Finally, we address the state's argument that, even if the challenged provision is based on content or viewpoint, it is valid because it is narrowly tailored to serve a compelling state interest. Strict scrutiny, which in this context requires the government to prove that it has employed necessary and narrowly tailored means towards achieving a compelling governmental interest, is an exacting standard. *See R.A.V.,* 505 U.S. at 395, 112 S.Ct. at 2549–50; *Republican Party of Minn. v. White,* 416 F.3d 738, 749 (8th Cir.2005) (noting that compelling governmental interest is an interest "of the highest order" (quotation omitted)). Because strict scrutiny is a more exacting test than application of the *R.A.V.* exceptions and the state has failed to meet any of those exceptions, it is not necessary for us to engage in an extended strict-scrutiny analysis.

 Here, the state's arguments under strict scrutiny are significantly hampered by the existence of alternative methods that could combat the harm caused by false statements that disturb government functions in a content-neutral manner. For example, 18 U.S.C. § 1001 (2006) pro-

---

9. In her brief, Crawley also argues that subdivision 2 is impermissibly based on content because it only criminalizes allegations that are about police officers, and not those about other public officials. This was the basis for the demise of similar California and Nevada statutes in *Hamilton,* 325 F.Supp.2d at 1091,

and *Eakins,* 219 F.Supp.2d at 1118. Because we have determined that the statute exhibits impermissible viewpoint discrimination and this was Crawley's main argument below and on appeal, we decline to conduct a separate *R.A.V.* analysis regarding other content- or viewpoint-based elements within the statute.

hibits the making of any knowingly false statement to federal officers. This provision exists "to protect the Government['s investigatory process] from being the victim of some positive statement which has the tendency and effect of perverting normal and proper governmental activities and functions." *Brogan*, 522 U.S. at 413, 118 S.Ct. at 814 (quotation omitted). This alternative suggests that the controversial distinction within the statute at issue here is not "necessary to serve [a] compelling interest." *See R.A.V.*, 505 U.S. at 395, 112 S.Ct. at 2550 (providing that the existence of a content-neutral alternative undercuts the defense of a content-based statute).[10]

## DECISION

Minn.Stat. § 609.505, subd. 2 criminalizes knowingly communicating false information regarding police only when that communication alleges misconduct. Because the distinction between false critical information and false exonerating information discriminates based on the viewpoint of the speaker and does not fit under a recognized exception to content discrimination, this subdivision of the statute violates the First Amendment. We reverse the judgment on count I and remand for the district court to address the lesser-included offense and resentence.

**Reversed and remanded.**

HARTEN, Judge (dissenting).

I respectfully dissent. For the purposes of this dissent, I acquiesce in the majority

conclusion that *R.A.V. v. City of St. Paul* controls our analysis because Minn.Stat. § 609.505, subd. 2 (2006), subclassifies certain police-misconduct complaints within a "proscribable" speech field. *See* 505 U.S. 377, 384–87, 112 S.Ct. 2538, 2543–45, 120 L.Ed.2d 305 (1992). But I disagree with the majority's analysis under *R.A.V.* and rejection of the state's legitimate purpose behind the statute.

I first disagree with the majority's classification of the "proscribable" speech at issue as *lies* rather than *defamation*. *R.A.V.* made clear that the courts have limited the areas of "proscribable" speech to obscenity, defamation, and fighting words. *R.A.V.*, 505 U.S. at 382–83, 112 S.Ct. at 2542–43; *accord Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). These speech classes constitute a select group historically recognized as remarkably valueless because "their very utterance inflict[s] injury or tend[s] to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. at 769. A mere lie, on the other hand, does not *automatically* inflict injury or incite violence.

The challenged provision covers allegations of professional misconduct by police. Minn.Stat. § 609.505, subd. 2. Such statements are defamatory. *See* Restatement (Second) of Torts § 559 (1977) (defining defamatory communication as one that "tends so to harm the reputation of another as to lower him in the estimation of the

---

**10.** We also note that Crawley and amicus curiae contend that the challenged provision is overbroad and has a chilling effect on protected speech by discouraging good-faith complaints. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244, 122 S.Ct. 1389, 1399, 152 L.Ed.2d 403 (2002) (noting that statute violates First Amendment if "it prohibits a substantial amount of protected expression"). We recognize that this is a legitimate challenge to the statute and that the concurring Justices in *R.A.V.* found the St. Paul

ordinance void on this basis. 505 U.S. at 411–14, 112 S.Ct. at 2558–60 (White, J., concurring in judgment). But because Crawley did not raise the issue below, and we have concluded that the statute is an impermissible viewpoint-based speech restriction, we decline to reach the overbreadth challenge. *See Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996) (noting that appellate court will generally not consider matters not argued to or decided by the district court).

community or to deter third persons from associating or dealing with him"). Defamation is the brand of proscribable speech asserted by the state. Defamation is the only brand of proscribable speech applicable here.

My concern with proper classification is not motivated by semantics, or by countenancing dishonesty, but rather by fear that the majority approach alters Supreme Court jurisprudence and, in effect, expands the state's ability to criminalize speech. Knowingly false statements have only been deemed proscribable when they are harmful. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) (noting lie's lack of value in defamation context); *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190, 68 S.Ct. 591, 597–98, 92 L.Ed. 628 (1948) (noting fraud's lack of value). But if the category of proscribable speech is merely *knowing falsehoods,* the state could in blanket fashion criminalize all lies, regardless of whether they inflict harm. For the state to have authority to punish a starving person's response, "I'm well," to the question, "How are you?," surely runs against notions of expressive freedom.

And because *defamation* automatically denotes injury, the fact that the challenged statute doesn't also punish dishonest praises makes plain sense. *R.A.V.* allows the state to punish content-based types of proscribable speech when the distinction involves the "very reason" the speech is proscribable. 505 U.S. at 388–89, 112 S.Ct. at 2545–46. The reason defamation is proscribable is "society['s] pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer,* 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966); *accord Rosenbloom,* 403 U.S. at 48–49, 91 S.Ct. at 1822. Speech is not defamatory if it is not critical. *See* Restatement (Second) of Torts

§ 559 (providing that "a communication is defamatory only if it harms another's reputation"). Therefore, the statute's lack of application to *complimentary* lies about police officers is consonant with First Amendment traditions.

The state may also punish specific types of defamation that create harmful "secondary effects" unrelated to speech content. *R.A.V.,* 505 U.S. at 389–90, 112 S.Ct. at 2546–47. Examination of asserted secondary effects does not involve strict scrutiny: the governmental interest only must be "substantial" and leave "reasonable alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986) (cited in *R.A.V.,* 505 U.S. at 389, 112 S.Ct. at 2546). Moreover, the burden to produce evidence of the effects is minimal; the legislature "is in a better position than the Judiciary to gather and evaluate data on local problems." *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 440, 122 S.Ct. 1728, 1737, 152 L.Ed.2d 670 (2002) (plurality opinion); *accord Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931.

The state shows that frivolous complaints of police misconduct have imposed heavy burdens on law enforcement and wasted police resources. That these effects were the predominate concern behind the statute is confirmed by the state's consistent arguments to this court, statements by legislators, reports and data produced at committee hearings, and the district court's finding below. *See Renton,* 475 U.S. at 47–48, 106 S.Ct. at 929 (providing that regulation was justified where city council's predominate concerns were with secondary effects). Prior to the challenged provision's passage, it was discovered that a high number of officer-misconduct accusations were completely unfounded or made with bad faith.[11] These accusations posed a serious public

---

11. As stated during the hearing considering

the statute, a report of misconduct complaints

problem because any complaint automatically invokes an investigation under state law. *See* Minn. R. 6700.2600 (2009). This unquestionably diverts police resources away from solving actual crimes and directs them towards investigating bogus complaints. Witnesses attested to these significant costs at committee hearings. Hearing on H.F. 618 Before the H. Comm. On Public Safety and Oversight (Feb. 15, 2005) (statements of Rep. Cornish, witness Gillespie, and witness Johnston).

Crawley's contention that pro-police falsehoods are just as harmful as misconduct allegations is fallacious. The costly investigatory procedures triggered by reception of a misconduct complaint are unnecessary when someone files a report of an officer's good behavior. Minn. R. 6700.2600 (requiring law-enforcement agencies to investigate "complaints which allege misconduct"); *Professional Conduct of Peace Officers Model Policy* I (revised May 2003) (establishing policy to "investigate circumstances that suggest an officer has engaged in unbecoming conduct") (developed pursuant to Minn.Stat. § 626.8457 (2008)). The initiation of an entire investigation, which only occurs upon the receiving of a *complaint*, poses a significantly higher burden on law enforcement than a false statement lauding police conduct.

It is also noteworthy that the provision requires that a knowingly false complaint reach an officer entitled to investigate or report it. Minn.Stat. § 609.505, subd. 2. This leaves a reasonable opportunity for individuals to intentionally defame police endlessly so long as they do not take affirmative efforts to cause those comments to reach officers who must investigate or report their spurious allegations.

The layers of scrutiny employed by the majority to discredit the legislative interest in targeting these secondary effects are unwarranted. Justice Holmes declared, "The life of the law has not been logic: it has been experience." Oliver Wendell Holmes, Jr., *The Common Law* 1 (Dover Publ'ns, Inc., 1991). By struggling to rationalize why this enactment is void, I believe the majority eschews Holmes's maxim and our traditional respect for legislative institutions' ability to measure and react to local problems.

Because the secondary effects targeted by the challenged provision justify the regulation without reference to the underlying speech, I would affirm the district court's judgment.

---

from Minneapolis showed that the "vast majority" were unsustained, with 30 proven false and only 7 sustained. Hearing on H.F. 618 Before the H. Comm. On Public Safety and Oversight (Feb. 15, 2005) (statement of witness Gillespie). A St. Paul study showed that, out of around 222 complaints, in excess of 200 were unsustained, 17 or 18 were proven false, and only 5 were sustained. *Id.*